

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 12, 2026**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BUCA C, LLC | § | CASE NO. 24-80060-SGJ-7 |
|     DEBTOR. | § | (CHAPTER 7) |
| | § | |
| _____ | § | |
| ROBERT YAQUINTO, JR., | § | |
| Chapter 7 Trustee, *et al.*, | § | ADVERSARY NO. 25-08003 |
|     PLAINTIFFS, | § | (CIV. ACTION # 3:25-cv-03563-S) |
| | § | |
| VS. | § | |
| | § | |
| ROBERT EARL, *et al.*, | § | |
|     DEFENDANTS. | § | |

### REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT (1) DENY MOTION TO WITHDRAW THE REFERENCE AND (2) DENY MOTION TO TRANSFER VENUE AS TO THE FORUM SELECTION CLAUSE

# Table of Contents

I.      INTRODUCTION ...................................................................................................... 3

II.     NATURE OF THE ADVERSARY PROCEEDING ...................................................... 4

    A.      The Parties. ....................................................................................................... 4

        1.      *The Plaintiffs* ............................................................................................... 4

        2.      *Defendants Robert Earl, Planet Hollywood International, Inc., and Thomas Avallone.* ................................................................................................. 4

        3.      *The Remaining Defendants (Earl-Affiliated Defendants)* ........................... 5

    B.      The Procedural History. .................................................................................... 6

    C.      The Theories, Claims, and Relief Urged in the Plaintiffs' Complaint ................... 6

    D.      The Motion to Withdraw the Reference and Response and Reply. ...................... 14

III.    A MIXTURE OF CORE AND NONCORE CLAIMS ARE INVOLVED, BUT CORE CLAIMS PREDOMINATE ........................................................................................ 17

IV.     JURY TRIAL RIGHTS AND DEMANDS ................................................................. 20

V.      PENDING MATTERS ............................................................................................. 23

VI.     RECOMMENDATION ............................................................................................ 25

## I.  INTRODUCTION

The above-referenced adversary proceeding ("Adversary Proceeding"), filed June 13, 2025, relates to the bankruptcy case of BUCA C, LLC ("BUCA C"). BUCA C filed a voluntary Chapter 11 petition on August 8, 2024, along with nine other affiliated companies (collectively, the "Debtors"). The Debtors owned, operated, and franchised family-style Italian American restaurants under the name "Buca di Beppo." At the time of the filing of the 2024 bankruptcy case, the Debtors owned 44 locations in 14 states and franchised two locations internationally.[1] Each of these Debtors' cases was jointly administered under Case Number 24-80058.[2] On February 5, 2025, after a sale process during the Chapter 11 phase of the case, the jointly administered case was converted from Chapter 11 to Chapter 7.[3]  Thereafter, Robert Yaquinto, Jr. was appointed as the Chapter 7 Trustee (the "Trustee") over the Debtors.

The Trustee, along with certain co-plaintiffs described below, brought this Adversary Proceeding, in his capacity as Chapter 7 Trustee for the BUCA C bankruptcy estate. The live complaint in this Adversary Proceeding is the *Plaintiffs' Second Amended Original Complaint* filed on August 25, 2025.[4]

---

[1] *See Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, Case No. 24-80058, Dkt. 2.  Apparently, the Buca di Beppo restaurants were started in the 1990's, was a public company for a while, grew to 89 restaurants, but was plunged into (and survived) an earlier bankruptcy case in 2008.

[2] *In re BUCA Texas Restaurants, L.P.*, Case No. 24-80058.

[3] *See Adversary Proceeding* No. 24-80058, Dkt. 557.

[4] Adversary Proceeding No. 25-08003, Dkt. 27.

## II.    NATURE OF THE ADVERSARY PROCEEDING

### A. The Parties.

There are twelve parties in this Adversary Proceeding—five Plaintiffs and seven Defendants.

#### 1. *The Plaintiffs*

As noted, the Trustee is the lead Plaintiff. Another Plaintiff is Main Street Capital Corporation ("Main Street"). Main Street is an investment firm that provides long-term debt and equity capital to companies. The remaining Plaintiffs—MSC Income Fund, Inc. ("MSCIF"), Main Street Equity Interests, Inc., and MSC Equity Holding, LLC—are lender entities affiliated with Main Street (collectively, the "Main Street Plaintiffs"). These Main Street Plaintiffs provided financing to BUCA C and related borrowers and are asserting claims against one or more of the Defendants arising from alleged contractual breaches, fiduciary misconduct, and the diversion of borrower revenues during periods of default.

#### 2. *Defendants Planet Hollywood International, Inc., Robert Earl, and Thomas Avallone*

PHI. Among the seven Defendants is Planet Hollywood International, Inc., n/k/a PB Restaurants, LLC ("PHI'). PHI acquired BUCA Inc., now known as BUCA, LLC, in or around 2008. Note that BUCA, LLC was not a debtor in the above-referenced jointly administered bankruptcy cases, but is a non-debtor Defendant in this Adversary Proceeding. Interestingly, PHI filed its own voluntary petition under Chapter 11 in the U.S. Bankruptcy Court for the Middle District of Florida on April 4, 2025. PHI filed a proof of claim in this bankruptcy case[5] and agreed in its own bankruptcy case to be named in this Adversary Proceeding.

---

[5] Claim No. 237.

Earl. Defendant Robert Earl (Earl")—a film producer, investor, restaurateur, and television personality—was at all material times, upon information and belief, a Manager, President, and direct or indirect owner of PHI. Earl is also the guarantor of certain debts owed by BUCA C to Main Street. Earl, once he and PHI became involved, made various changes in BUCA Inc.'s operations, including creating BUCA C to own and operate the Buca di Beppo restaurants. PHI, through one or more subsidiaries, owned most of the equity interests in BUCA C. PHI previously provided management, accounting, administrative, and clerical services to BUCA C. Earl filed a proof of claim in the BUCA C bankruptcy.[6]

Avallone. Defendant Thomas Avallone ("Avallone") was at all material times, upon information and belief, Manager, President, and CEO of BUCA C and a Manager and officer of PHI. Avallone has worked with Earl in many respects. Most notably, Avallone serves as a manager and the executive vice president, treasurer, and assistant secretary of PHI. He was further the manager, president, and CEO of BUCA C.

3. *The Remaining Defendants (Earl-Affiliated Defendants)*

The remaining four Defendants, which are all affiliated with Earl (collectively, the "Earl-Affiliated Defendants"), include the aforementioned BUCA, LLC, plus Virtual Dining Concepts, LLC ("Virtual Dining"), Earl Enterprises Corporate, LLC ("Earl Enterprises"), and Mealz Dining Pass, LLC ("Mealz"). Of these, only BUCA, LLC filed a proof of claim in the BUCA C bankruptcy.[7]

---

[6] Claim No. 239.
[7] Claim No. 238.

### B. The Procedural History.

As noted above, the governing complaint is the *Second Amended Original Complaint,* which was filed on August 25, 2025. This Adversary Proceeding was first initiated on June 13, 2025, with a subsequent amended complaint filed on June 18, 2025. Defendants Earl, Avallone, Earl Enterprises, Virtual Dining, and BUCA, LLC were served with summonses between June 30, 2025, and July 2, 2025. Defendants PHI and Mealz were not added to this Adversary Proceeding until the Second Amended Original Complaint was filed; thus PHI and Mealz were served on September 15, 2025, and September 8, 2025, respectively. After a series of unopposed Motions to Extend Time to File an Answer or Response, Defendants filed their *Amended Motion to Withdraw the Reference, Demand for a Jury Trial, and Notice of Non-Consent to Entry of Final Orders* on October 6, 2025.[8] That same day, Defendants also filed an *Amended Motion to Transfer Venue*.[9] Plaintiffs responded in opposition to Defendants' motions on October 27, 2025, with Defendants replying on November 12, 2025.[10]

### C. The Theories, Claims, and Relief Urged in the Plaintiffs' Complaint.

As described above, Defendants are comprised of two individuals who had some sort of control over the five, entity-Defendants. It is fair to say that the claims all derive from a common nucleus of operative facts. Those facts revolve around three different agreements: the Loan Agreement, the Services Agreement, and the Subordination Agreement.

---

[8] Adversary Case No. 25-08003, Dkt. 37.
[9] Adversary Case No. 25-08003, Dkt. 38. Defendants also filed a motion to dismiss this Adversary Proceeding on the same day—however, this Court asserted it would not not hear this motion until the District Court's determination on the Motion to Withdraw the Reference.
[10] *See* Adversary Case No. 25-08003, Dkts. 47–49 and 51–53.

The Loan Agreement: The initial transaction among Main Street, BUCA C, and PHI has been described as "complex."[11] In June 2015, Main Street and MSCIF (collectively, the "Lenders") provided a senior secured term loan (the "Loan Agreement") totaling $47 million to BUCA C and its subsidiaries (collectively, the "Borrowers").[12] The Loan Agreement included an initial term loan in the amount of $42 million and delayed terms in the aggregate amount of $5 million. As part of the transaction, the Lenders provided a $6 million minority equity investment equating to a ten percent equity membership in BUCA C. The remaining ninety percent equity interest was owned by BUCA, LLC.

The Services Agreement: Contemporaneously, BUCA C and PHI entered an Accounting, Management, and Administrative Services Agreement (the "Services Agreement"). Under the Services Agreement, PHI was designated as BUCA C's manager and acted as BUCA C's agent and representative. Further, under the Services Agreement, PHI provided management services to several of BUCA C's restaurants. BUCA C agreed to pay PHI an annual amount of $3 million for the cost of those corporate level employees (employed by PHI) and an annual management fee of $4.4 million paid in twelve, equal monthly installments. The Service Agreement addressed: the allocation of shared revenues and expenses between BUCA C and other entities affiliated with PHI; the services PHI agreed to provide to BUCA C; and that PHI was required to maintain segregated bank accounts in the name of BUCA C while ensuring funds in such accounts were not commingled with other PHI funds and that those funds were only disbursed in accordance with

---

[11] For a more comprehensive look at the "complex[ity]" of the initial transaction *see* Adversary Case No. 25-08003, Dkt. 27, Pg. 8–9.
[12] As of November 2024, Main Street and MSCIF assigned their rights as Lenders under the Loan Agreement to Plaintiffs Main Street Equity Interests, Inc. and MSC Equity Holding, LLC.

the Services Agreement.[13] PHI also allegedly agreed to perform "in a manner consistent with the fiduciary duties of loyalty and care owed by a manager of a limited liability company to such company and its members" and that it would "never take any actions on behalf of BUCA C that would result in BUCA C being in material breach of the Loan Agreement."[14]

The Subordination Agreement: Also contemporaneously with the Loan Agreement, BUCA C, Main Street, and PHI entered a Management Fee Subordination Agreement (the "Subordination Agreement"). The Subordination Agreement was intended to protect the financial interests of the Lenders in the event of defaults under the Loan Agreement. Specifically, the Subordination Agreement subordinated PHI's receipt of certain "Management Fees" to the prior payment in full of all the Borrowers' financial "Obligations" (as defined in the Loan Agreement), including any Senior Debt.[15] Together, the three Agreements all worked together to ensure such a result.

First, the Subordination Agreement expressly prohibited PHI from accepting any Management Fees other than those expressly permitted to be paid pursuant to the Loan Agreement until the Borrowers paid all Senior Debt in full. Next, the Loan Agreement prohibited the Borrowers from paying certain Management Fees to any Affiliate of the Borrowers or reimbursing any Affiliate of the Borrowers for expenses incurred in connection with the management of the Borrowers if any Borrower is in a Payment Default or Specified Default. Lastly, the Services Agreement provided that, if any part of the Management Fee is not payable pursuant to the terms

---

[13] The Services Agreement presumably addresses many other aspects of the relationship, but these were specifically addressed by Plaintiffs in their Second Amended Complaint.

[14] *See* Adversary Case No. 25-08003, Dkt. 27, Pg. 11; further, this Court uses the word "allegedly" since it has not actually seen the Services Agreement at this point.

[15] Senior Debt includes any principal, interest, fee, expenses, and any other obligations owed by the Borrowers to the Lenders.

of the Loan Agreement in connection with a default thereunder, such amount is not payable under the Services Agreement.

The Second Amended Complaint includes twenty-two counts. The following chart summarizes the counts, against whom each is asserted, and the Bankruptcy Court's conclusions as to their statutory "core" or "noncore" nature.

| Count No. | Claim | Defendants | | | | Core or Noncore |
| | | PHI | Earl | Avallone | Earl-Affiliates | |
|---|---|---|---|---|---|---|
| 1 | Breach of Subordination Agreement | X | | | | Noncore |
| 2 | Breach of Service Agreement | X | | | | Noncore |
| 3 | ~~Misappropriation of Intercompany Funds/Conversion~~[16] | ~~X~~ | | | | |
| 4 | Breach of Fiduciary Duty of Loyalty | X | | | | Noncore |
| 5 | Breach of Fiduciary Duty of Care | X | | | | Noncore |
| 6 | Aiding and Abetting Breach of Fiduciary Duty of Loyalty | | | | X[17] | Noncore |
| 7 | Aiding and Abetting Breach of Fiduciary Duty of Care | | | | X[18] | Noncore |
| 8 | Breach of Fiduciary Duty Owed to BUCA C | | | X | | Noncore |
| 9 | Aiding and Abetting Breach of Fiduciary Duty Owed to BUCA C | | X | | X[19] | Noncore |
| 10 | Tortious Interference with the Subordination Agreement | | X | X | X[20] | Noncore |
| 11 | Tortious Interference with the Services Agreement | | | | X[21] | Noncore |

---

[16] Plaintiffs do not intend to pursue Count III. *See* Adversary Proceeding 25-08003, Dkt. 49, n.3.
[17] Against BUCA, LLC, Earl Enterprises, and Virtual Dining.
[18] Against BUCA, LLC, Earl Enterprises, and Virtual Dining.
[19] Against BUCA, LLC, Earl Enterprises, and Virtual Dining.
[20] Against BUCA, LLC, Earl Enterprises, and Virtual Dining.
[21] Against BUCA, LLC, Earl Enterprises, and Virtual Dining.

| Count No. | Claim | Defendants | | | | Core or Noncore |
|---|---|---|---|---|---|---|
| | | PHI | Earl | Avallone | Earl-Affiliates | |
| 12 | Unjust Enrichment and Money Had and Received | | | | X[22] | Noncore |
| 13 | Actual Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A) and Recovery Under 11 U.S.C. § 550 | X | | | X | Core |
| 14 | Actual Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Tex. Bus. Com. Code § 24.005 and Recovery Under 11 U.S.C. § 550 and Tex. Bus. Com. Code § 24.008 | X | | | X | Core |
| 15 | Constructive Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) and Recovery Under 11 U.S.C. § 550 | X | | | X | Core |
| 16 | Constructive Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Tex. Bus. Com. Code § 24.005 and § 24.006 and Recovery Under 11 U.S.C. § 550 and Tex. Bus. Com. Code § 24.008 | X | | | X | Core |
| 17 | Preferential Transfer Under 11 U.S.C. § 547 and Recovery Under 11 U.S.C. § 550 | X | | | X | Core |

[22] Against BUCA, LLC, Earl Enterprises, and Virtual Dining.

| Count No. | Claim | *Defendants* | | | | Core or Noncore |
|---|---|---|---|---|---|---|
| | | PHI | Earl | Avallone | Earl-Affiliates | |
| 18 | Disallowance of Claims Pursuant to 11 U.S.C. § 502(d) | X | X | | X[23] | Core |
| 19 | Breach of 2023 Guaranty | | X | | | Noncore |
| 20 | Objection to Proof of Claim No. 237 | X | | | | Core |
| 21 | Objection to Proof of Claim No. 238 | | | | X[24] | Core |
| 22 | Objection to Proof of Claim No. 239 | | X | | | Core |

To be clear, all the claims asserted by Plaintiffs stem from or are connected to the above-described "Agreements": the Loan Agreement, the Services Agreement, and the Subordination Agreement.

Essentially, as to the noncore claims, Plaintiffs assert that (a) PHI breached the Subordination Agreement by receiving Management Fees and expense reimbursements to which it was not entitled while the Borrowers were in default, among other reasons; (b) as a manager and officer of BUCA C, Avallone breached his fiduciary duties owed by allowing BUCA C to pay Management Fees and expenses to PHI and to the Earl-Affiliated Defendants and by allowing BUCA C to participate in a multi-restaurant gift card program administered by Mealz; (c) PHI breached the Services Agreement for a plethora of reasons and breached its fiduciary duty of loyalty and care under the Services Agreement while the Earl-Affiliated Defendants aided and

---

[23] Against BUCA, LLC.
[24] Against BUCA, LLC.

abetted those duties[25]; (d) the Earl-Affiliated Defendants tortiously interfered with the Subordination Agreement and the Services Agreement by causing PHI to breach those agreements or by making and by receiving payments to which they were not entitled and it would be inequitable for the Earl-Affiliated Defendants to retain those benefits; and (e) Earl breached a personal guaranty with Main Street and the other Lenders where Earl guaranteed repayment under the Loan Agreement and to pay Main Street a "Guaranteed Obligation" when the Borrowers defaulted on the Loan Agreement.

The core claims can be placed into two bundles: (1) those asserting fraudulent and preferential transfers and (2) those involving proofs of claims.

Plaintiffs assert that, during the applicable time period, actual fraudulent transfers occurred from BUCA C to or for the benefit of PHI and the Earl-Affiliated Defendants, including failing to properly allocate revenue, permitting Mealz to impose a gift card discount expense on BUCA C, transferring Management Fees and expense reimbursements while the Borrowers were in default, and making other unauthorized payments. Plaintiffs assert BUCA C was indebted to the non-BUCA Plaintiffs and became further indebted to those Plaintiffs as of the date that such transfers were made. Plaintiffs believe the facts show BUCA C had actual intent to hinder, delay, or defraud creditors.[26] Further, Plaintiffs also assert constructive fraudulent against the same Defendants for the same reasons. Plaintiffs claim the transfers constitute constructive fraudulent transfers because BUCA C received less than reasonably equivalent value in exchange for the transfers made and because BUCA C was insolvent immediately before the transfers or intended to incur debts beyond

---

[25] According to Plaintiffs, the Services Agreement expressly created an agency relationship with BUCA C as principal and PHI as agent.
[26] See Adversary Proceeding 25-08003, Dkt. 27, Pg. 43 for full allegations.

its ability to pay as they matured. Finally, Plaintiffs believe preferential transfers occurred between BUCA C and PHI and the Earl-Affiliated Defendants. It is asserted that, to the extent the preferential transfers were on account of an antecedent debt, the transfer enabled PHI and the Earl-Affiliated Defendants to receive more than those parties would have received pursuant to a chapter 7 distribution.

The fraudulent transfer and insider preference actions against all Defendants are brought under the relevant Bankruptcy Code and Texas Uniform Fraudulent Transfer Act ("TUFTA") sections.[27]

Finally, Plaintiffs ask for claims by Earl, PHI, and BUCA, LLC to be disallowed while also objecting to the proof of claim filed by each of those Defendants.[28]

### D. The Motion to Withdraw the Reference, and Response and Reply.

Defendants, on July 30, 2025, filed their *Motion to Withdraw the Reference, Demand for Jury Trial, and Notice of Non-Consent to Entry of Final Orders*.[29] Defendants' motion was amended on October 6, 2025.[30] The Bankruptcy Court held a status conference, as required by Local Bankruptcy Rule 5011-1, on December 2, 2025, to assist in the Bankruptcy Court's preparation of this Report and Recommendation. On December 31, 2025, the above-captioned District Court civil action was created and assigned to the Honorable Karen Scholer.

---

[27] *See* 11 U.S.C. §§ 544, 547(b), 548(a)(1)(A), 548(a)(1)(B), 550(a); *See also* Tex. Bus. & Com. Code §§ 24.005, 24.006(a) & (b), 24.008.

[28] PHI filed a proof of claim in the amount of $17,872,903.95 based on management fees allegedly outstanding under the Services Agreement; BUCA, LLC filed a proof of claim for $7,625,247.00 based on management fees and reimbursements allegedly outstanding under the Servies Agreement; and Earl filed a proof of claim for $3,082,267.10 based on amounts outstanding under a subordinated unsecured promissory note between Earl and BUCA C.

[29] Adversary Proceeding 25-08003, Dkt. 18.

[30] Adversary Proceeding 25-08003, Dkt. 37.

1. *The Movants' Position.*

Defendants argue that withdrawal of the reference for Counts 1–9 and 19 "is required for cause and to preserve Defendants' Constitutional rights."[31] Specifically, Defendants argue that those Counts are noncore in nature in which they have a right to a jury trial. Setting aside Defendants' argument regarding their jury trial rights (discussed below), Defendants believe the *Holland America* factors weigh in favor of withdrawing the reference.[32] But in *Holland America*, the Fifth Circuit did not actually apply the factors stated—only listed the factors for "which the district court should consider" on remand.[33] Further, the Fifth Circuit explicitly stated "[t]he posture of this case *does not* permit us to offer more than general principles that should guide the district court in determining whether to refer or withdraw the reference" and was written at a time where "[l]ittle precedent yet exist[ed]" on the district court determining whether to refer or withdraw the reference.[34] Thus, *Holland America* provides no guidance on *how* to apply its factors. But Defendants do not cite any case law that applies the *Holland America* factors in their motion. Nevertheless, Defendants develop their own understanding of *Holland America* and apply the factors by arguing permissive withdrawal of the reference is supported because: Plaintiffs' claims contain noncore issues; judicial economy is served given Defendants' demand for a jury trial and nonconsent to a jury trial before the bankruptcy court; forum shopping is not an issue because Defendants' request is to "ensur[e] their due process rights"[35]; uniformity is served by withdrawal

---

[31] Adversary Proceeding 25-08003, Dkt. 37, Pg. 6.
[32] *Holland Am. Ins. Co. v. Roy*, 777 F.2d 992, 999 (5th Cir. 1985); "The district court should consider the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process."
[33] *Id.*
[34] *Id.* at 998 (emphasis added); *Holland America* also stated the "district court must keep one eye cocked toward" *Northern Pipeline Const. v. Marathon Oil Pipe Line Co.*, 458 U.S. 50 (1982), which the Fifth Circuit described as the "progenitor of the new bankruptcy court jurisdictional scheme"—referring to the Bankruptcy Amendments Acts. *Id.*
[35] Though the contemporaneously filed Motion to Transfer Venue might suggest otherwise.

given this Adversary Proceeding is "not dominated by core claims"; proceeding before the bankruptcy court would increase judicial inefficiency; and bankruptcy process will not be delayed by withdrawing the reference.[36] In light of this argument, Defendants' main argument that withdrawal of the reference is required ultimately rests on its jury demand and nonconsent to the bankruptcy court conducting the jury trial. Thus, allegedly, mandatory withdrawal of the reference is implicated, at least as to the noncore claims—but if mandatory is not implicated, then permissive withdrawal is supported by *Holland America*.

    2.   *The Plaintiffs' Position*

Plaintiffs, subsequently, filed their response opposed to the *Motion to Withdraw the Reference*.[37] Plaintiffs believe Defendants' true goal is to prevent this Bankruptcy Court from hearing causes of actions and claim objections related to what led BUCA C to file for bankruptcy. Plaintiffs argue that the Bankruptcy Court should retain this Adversary Proceeding for all pre-trial motions, including dispositive motions. Plaintiffs walked through factors found in *Nieman Printing* to support their stance that cause does not exist to withdraw the reference at this stage of the Adversary Proceeding.[38] The bulk of the Plaintiffs' argument revolves around what they cite as "the most important factor": whether the claims are core or noncore.[39] Plaintiffs argue the Counts are core matters because they involve fraudulent transfers, preferences, claim objections, counterclaims against the entities who filed proofs of claims, or are intermingled with the claims resolution process and each of those are statutorily core matters under 28 U.S.C. § 157(b)(2)(B),

---

[36] *See* Adversary Proceeding No. 25-08003, Dkt. 37, Pgs. 7–9.
[37] Adversary Proceeding No. 25-08003, Dkt. 48.
[38] *See In re Nieman Printing, Inc.*, No. 21-31134-SGJ7, 2024 WL 2027490, at *5 (Bankr. N.D. Tex. Mar. 4, 2024).
[39] *See* Adversary Proceeding No. 25-08003, Dkt. 37, Pg. 48 (citing *In re BJ Servs., LLC*, No. 20-33627, 2023 WL 2395749, at *2 (Bankr. S.D. Tex. Mar. 6, 2023).

(C), (F), (H), or (O). Further, Plaintiffs believe each count "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process" in line with *Stern v. Marshall*, 564 U.S. 462, 499 (2011). Plaintiffs point out that Counts 13–17 are fraudulent transfer or preference causes of action; Count 18 seeks to disallow claims under section 502(d) of the Bankruptcy Code; and Counts 20–22 separately object to proofs of claims filed in the bankruptcy case that are based on or related to one of the Agreements. Further, Plaintiffs argue—since, allegedly, the Agreements are related as part of an integrated transaction—the Counts against PHI, BUCA, LLC, and Earl would be resolved in the claims process as part of the claims asserted by those Defendants. And, Plaintiffs argue, even the state law claims against those Defendants who did not file a proof of claim rely on the same facts and are necessary to the claims adjudication process because they involved persons or entities controlled by Earl and Avallone, who allegedly directed every act.[40] In sum, according to Plaintiffs, this Bankruptcy Court may enter a final order on each count in the complaint and should retain this Adversary Proceeding for all pre-trial matters, including dispositive matters.[41]

## III.  A MIXTURE OF CORE AND NONCORE CLAIMS ARE INVOLVED, BUT CORE CLAIMS PREDOMINATE

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy proceedings (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: those that "aris[e] under title 11"; those that "aris[e] in" a Title 11 case; and those that are "related to" a case under title 11.[42]  Further, those that arise under Title 11 or arise in a Title 11 case are defined as

---

[40] Adversary Proceeding No. 25-08003, Dkt. 48, Pgs. 7–9.
[41] *Id* at 9, 19.
[42] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. at 473-474.

"core" matters and those that are merely "related to" a Title 11 case are defined as "noncore" matters.[43] The significance of the "core"-"noncore" distinction is that bankruptcy courts may statutorily hear and enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157. But while a proceeding may be "core" in nature under 28 U.S.C. § 157(b)(2) which the bankruptcy court, therefore, has the *statutory* power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on the bankruptcy court is Constitutional (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[44]

With respect to the Counts brought against PHI, all counts are statutorily core in nature.[45] While Counts 1–2 and 4–5 can exist outside of the context of a bankruptcy case, they are nevertheless statutory "core," pursuant to 28 U.S.C. § 157(b)(2)(C)—to the extent they are counterclaims to PHI's proof of claim (which the Bankruptcy Court believes they are). Moreover,

---

[43] *Stern v. Marshall*, 564 U.S. at 473–74. Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).
[44] *Stern v. Marshall*, 564 U.S. at 499.
[45] 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H), (O).

the Bankruptcy Court believes there is no Constitutional problem with it adjudicating all of Plaintiffs' claims against PHI because resolving those claims will be necessarily and inextricably intertwined with the process of resolving PHI's proof of claim.

A similar analysis follows for the other two Defendants that filed a proof of claim in BUCA C's bankruptcy proceeding: Earl and BUCA, LLC. While Counts 9–10 and Count 19 against Earl and Counts 6–7 and Counts 9–12 against BUCA, LLC can exist outside bankruptcy, they are nevertheless statutory "core"—to the extent they are counterclaims to the respective Defendants' proof of claim (which the Bankruptcy Court believes they are).[46] The same belief that no Constitutional problems exist applies here as well.

To be certain, the mere fact that PHI, Earl, and BUCA, LLC have filed proofs of claim in the bankruptcy case did not automatically give the Bankruptcy Court the Constitutional authority to adjudicate all of Plaintiffs' claims against those Defendants.  However, because Plaintiffs' claims are essentially counterclaims to those proofs of claim that are inextricably intertwined with resolving the proofs of claim themselves, the Bankruptcy Court can Constitutionally issue final orders and judgments—even though some Counts might exist outside of the realm of bankruptcy.

Turning now to those Earl-Affiliated Defendants who did not file a proof of claim, Plaintiffs have brought both claims involving preferences and fraudulent conveyances *and* claims that can exist outside of bankruptcy.[47] Counts 13–17 are claims against the Earl-Affiliated Defendants alleging fraudulent transfers and preferential transfers—claims that are statutory core

---

[46] 28 U.S.C. § 157(b)(2)(C); Counts 18 and 22 against Earl are statutory core under 28 U.S.C. § 157(b)(2)(A), (B), and (O) while Counts 13–18 and 21 are against BUCA, LLC are statutory core under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

[47] The one exception here is Mealz.  Plaintiffs only bring preferences and fraudulent transfer claims against Mealz. Those claims are statutory core under 28 U.S.C. § 157(b)(2)(F) and (H).

under 28 U.S.C. § 157(b)(2)(F) and (H). To the extent these claims are asserted against non-claimant Defendants, they may constitute *Stern*-type claims for Constitutional purposes. But, even where Constitutional authority to enter a final judgment may be lacking, the Bankruptcy Court retains authority to hear the claims, supervise the discovery, resolve dispositive motions, and submit proposed findings of fact and conclusions of law to the District Court.[48]

As to the claims asserted against the Earl-Affiliated Defendants who did not file proofs of claim, and to the extent those claims are not integral to the claims-allowance process, such claims constitute noncore "related to" proceedings because the outcomes of those claims will have an impact on the bankruptcy estate being administered.[49] Further, the claims brought against Avallone would similarly be "related to" proceedings.[50] These claims are state law causes of action that neither "arise under" Title 11 nor can only "arise in" a Title 11 case, but are nevertheless "related to" the bankruptcy case, because the outcome of those Counts will have an impact on the bankruptcy estate being administered. Those claims arise from the same nucleus of operative facts as Plaintiffs' core claims and are intertwined with the avoidance actions. The Bankruptcy Court, again, retains authority to hear the claims, supervise the discovery, resolve dispositive motions, and submit proposed findings of fact and conclusions of law to the District Court.

## IV.    JURY TRIAL RIGHTS AND DEMANDS

Finally, Defendants have demanded a jury trial and do not consent to the Bankruptcy Court conducting a jury trial. Before analyzing Defendants' jury demand, a few words from the Honorable Leif Clark (Retired) have been provided:

---

[48] *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 36–37 (2014).
[49] Counts 6–7 and 9–12. As a reminder, Mealz is not included in these Counts.
[50] Counts 8 and 10.

> When a party in a given adversary proceeding filed in a bankruptcy case first demands a jury trial and then promptly refuses to consent to the conduct of that trial before the bankruptcy court, it is a safe bet that the tactic does not grow out of a zealous devotion to constitutional principles. In the vast majority of cases, the *real* reason for demanding a jury has less to do with a party's deep and abiding respect for either the jury system or the majesty of Article III of the Constitution and much more to do with either opportunistic delay or forum-shopping.[51]

*In re Blackwell ex rel. Est. of I.G. Servs., Ltd.*, 267 B.R. 724, 727–28 (Bankr. W.D. Tex. 2001) (emphasis in original).

Notwithstanding, pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable nonbankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[52]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[53] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[54] This analysis requires two steps: (1) a

---

[51] It is quite possible that forum shopping or opportunistic delay is the motivating factor in seeking to withdraw the reference because of the subsequently filed motion to transfer venue (later discussed herein). Further pointing to the possibility of those being a motivating factor, despite Defendants argument that judicial inefficiency would be increased by not withdrawing the reference and uniformity in the bankruptcy administration would be promoted by withdrawing the reference, it is not clear how this is true in a case where three out of seven Defendants filed a proof of claim in the bankruptcy case.

[52] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e).

[53] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).

[54] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[55]

By submitting proofs of claim in the bankruptcy case, PHI, BUCA, LLC, and Earl submitted to the Bankruptcy Court's equitable jurisdiction with respect to disputes that are integral to the allowance, disallowance, or priority of their asserted claims. When a creditor files a proof of claim, it submits itself to the equitable jurisdiction of the bankruptcy court, and disputes that are integral to the allowance or disallowance of that claim may be adjudicated by the bankruptcy court without a jury; thus, the act of filing a proof of claim can operate to deprive a creditor of a jury trial right.[56] As discussed above, the claims asserted against those Defendants—including avoidance actions, objections to claims, equitable subordination, and state-law causes of actions to the extent they function as counterclaims—are inextricably intertwined with resolution of their respective proofs of claim. By filing their proofs of claim, those Defendants have impliedly consented to the Bankruptcy Court's equitable jurisdiction and waived any jury trial right with respect to claims that are integral to the allowance, or priority of their asserted claims.[57]

So, what about those Defendants who did not file proofs of claim? With respect to those Defendants, the claims asserted against them include *Stern*-type claims and claims that are merely "related to" the bankruptcy case—accordingly, any applicable jury trial rights are preserved.[58] But this is not indicative that the reference should be withdrawn at this juncture. Even where a jury

---

[55] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).
[56] *See Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990).
[57] *See Id.*
[58] *See Granfinanciera*, 492 U.S. at 42–43, 56–59, n.14 (explaining that actions against non-claimant defendants are suits at common law and are not part of the claims-allowance process).

trial right exists and final adjudicatory authority may ultimately rest with the District Court, the Bankruptcy Court retains authority to hear the claims, supervise discovery, resolve dispositive motions, and submit proposed findings of fact and conclusions of law.[59] Withdrawal of the reference, if necessary to accommodate a jury trial, may be addressed if the proceeding becomes trial-ready.

## V.   PENDING MATTERS

On December 2, 2025, the Bankruptcy Court held the status conference on Defendants' *Motion to Withdraw the Reference.* At that time, the Bankruptcy Court stated that it would not hear the *Motion to Dismiss* pending the District Court's decision whether to withdraw the reference.

The Bankruptcy Court also heard the parties' positions on Defendants' *Amended Motion to Transfer Venue* filed October 6, 2025.[60] Because of a forum selection clause in one of the three Agreements at issue in this Adversary Proceeding (i.e., the Services Agreement), Defendants' request this Adversary Proceeding to be transferred to the United States District Court for the Middle District of Florida, Orlando Division.[61]

A motion to transfer venue of a bankruptcy adversary proceeding is governed by 28 U.S.C. § 1412, which permits transfer only if it is in the interest of justice or for the convenience of the parties. A forum-selection clause may be enforced under 28 U.S.C § 1404(a).[62] If a forum-selection

---

[59] *See Arkison*, 573 U.S. at 36–37.
[60] *See* Adversary Proceeding No. 25-08003, Dkt. 38.
[61] *See* Adversary Proceeding No. 25-08003, Dkt. 52, Pg. 2. There was also confusion as to where Defendants wanted to transfer this Adversary Proceeding. The proposed order, filed with the *Amended Motion to Transfer Venue*, identified the Bankruptcy Court for the Middle District of Florida as the transferee. But this was a "clerical error" according to Defendants.
[62] "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

clause is present, the court must adjust its analysis and "consider argument about public-interest factors only."[63]

Defendants rely on *Atlantic Marine* where the U.S. Supreme Court held that "forum-selection clauses should control except in unusual cases."[64] But the facts here are easily distinguishable from *Atlantic Marine*. First, *Atlantic Marine* was not decided in a bankruptcy context—it was an issue between a contractor and subcontractor not filed in connection with a bankruptcy. Second, the case involved a single plaintiff against a single defendant in which those two specific parties signed a contract with a forum-selection clause that controlled all of the issues. Here, there are three Agreements at play. The *only* Agreement to contain a forum selection clause is the Services Agreement; neither the Loan Agreement nor the Subordination Agreement contain a forum selection clause. The only parties to the Services Agreement are PHI and BUCA C—no other named Defendant nor Plaintiff in this Adversary Proceeding signed the Services Agreement. Further, there are twenty-two counts and only four counts deal with the Services Agreement: Count 2 (breach of the Services Agreement against PHI), Count 6 (tortious interference with the Services Agreement against the Earl-Affiliates), Count 20 (objection to PHI's proof of claim), and Count 21 (objection to BUCA, LLC's proof of claim). And, because PHI filed a proof of claim in the bankruptcy case based on management fees and reimbursements allegedly outstanding under the Services Agreement, the Trustee, here, is not bound by the forum selection clause because "a trustee . . . is not bound by a forum selection clause in an agreement provided the litigation at issue amount to a core proceeding and is not inextricably intertwined with non-core matters."[65]

---

[63] *Atlantic Mar. Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 63-65 (2013).
[64] *Atlantic Marine*, 571 U.S. at 64.
[65] *In re Commodore Int'l, Ltd.*, 242 B.R. 243, 261 (Bankr. S.D.N.Y. 1999).

Since only a status conference has been held, the parties were not required to provide evidence to the Bankruptcy Court on their position regarding the Motion to Transfer Venue. Normally, a motion to transfer venue is determined based on the preponderance of the evidence.[66] The Bankruptcy Court merely recommends here that the forum selection clause in the Services Agreement is not an appropriate basis to grant the Motion to Transfer Venue. The Bankruptcy Court recommends that Defendants request a hearing on the Motion to Transfer Venue at the appropriate court (whether it be the Bankruptcy Court or the District Court) after the District Court rules on the Motion to Withdraw the Reference. Then, the appropriate court may hear evidence from both parties (if anyone wants to present evidence other than the forum selection clause) bearing on whether a transfer of venue is appropriate under § 1412.

## VI.   RECOMMENDATION

For the foregoing reasons, this Bankruptcy Court recommends that the District Court ***deny*** the motion to withdraw the reference and ***deny*** the motion to transfer venue based on the forum selection clause found in the Services Agreement. The Bankruptcy Court also recommends that, if Defendants still have the desire to transfer the Adversary Proceeding under § 1412, then Defendants should file a motion to the appropriate court after the District Court determines whether the reference will be withdrawn so evidence may be heard.

***END OF REPORT AND RECOMMENDATION***

---

[66] *In re Think3, Inc.*, 529 B.R. 147, 208 (Bankr. W.D. Tex. 2015) (citing *Matter of Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1241 (5th Cir. 1979)).